IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Daniel Watson as the Personal Representative of the Estate of David W. Watson, | ) ) ) ) | Civil Action No.: 4:12-3437-BHH |
| Plaintiff, | ) ) ) | **ORDER AND OPINION** |
| vs. | ) ) ) ) | |
| Robert A. Adams, in his individual capacity as a police officer with the Town of Chesterfield; Eric Hewett, in his individual capacity as Chief of Police for the Town of Chesterfield; Leslie Davis, in his individual capacity as Lance Corporal with the South Carolina Highway Patrol; Town of Chesterfield; and South Carolina Department of Public Safety, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court on three motions for summary judgment: (1) Motion for Summary Judgment by South Carolina Department of Public Safety (ECF No. 125); (2) Renewed Motion for Summary Judgment by Leslie Davis (ECF No. 127); and (3) Motion for Summary Judgment by Robert A. Adams, Town of Chesterfield, and Eric Hewett (ECF No. 128). For the reasons set forth below, the motions are denied in part and granted in part.

## BACKGROUND AND PROCEDURAL HISTORY

This action arises out of the seizure and arrest of David W. Watson ("Watson"), a former detective with the Cheraw Police Department. The defendants in this case are three law enforcement officers, Leslie Davis ("Davis"), Robert Adams ("Adams"), and Eric

Hewett ("Hewett") (collectively, "Law Enforcement Defendants") as well as the state and local authorities who employ or employed them. Defendant Adams was or is a police officer under the command of Defendant Hewitt, who was or is the chief of police for the defendant Town of Chesterfield. Defendant Davis was a lance corporal in the South Carolina Highway Patrol, employed by the defendant the South Carolina Department of Public Safety (SCDPS).

Viewing the evidence in the light most favorable to Plaintiff and according him the benefit of all reasonable inferences, the facts of this case may be summarized as follows. At approximately 10:30 p.m. on June 2, 2012, Watson was sitting in his unmarked police vehicle in the parking lot of a Bojangles restaurant located at 1202 West Boulevard in Chesterfield, SC. Watson's vehicle was a white Ford Taurus without a permanent tag or other markings that would distinguish it as a police vehicle. It did however, have darkly tinted windows. Earlier that day, Watson had been at the house of Mary Florence ("Florence"), his estranged wife. (ECF No. 70-3 at 2–3.) According to Florence, Watson had "a reasonable amount" to drink that day and did not display any signs of intoxication when he left her house between 9 p.m. and 10 p.m. (*Id.* at 2.)

At approximately 10:49 p.m., Davis called Chesterfield Dispatch Emergency Services 911 ("Dispatch") to report a phone call he received. Davis told Dispatch, "My grandmother just called me. She's sitting in Bojangles. There's a white car with tinted windows come up and just parking outside. Nobody can see in it and they just want somebody to come by and check it out." (ECF No. 12-2 at 2.) He stated that the car was parked outside and has "just been backing up . . . around a[n] 18-wheeler . . . [and] they just can't figure out what [the driver of the car] is doing." (*Id.*) It is undisputed that Davis

fabricated at least the source of this information—neither of his grandmothers were living at the time.[1]

Dispatch relayed the information received from Davis to Adams. Specifically, Dispatch said that Davis claimed his grandmother called him from Bojangles, reporting "a white car, a four-door car with tinted windows that's out there in the gravel parking lot part." (ECF No. 12-3 at 2.) Dispatch explained to Adams that the car "keeps backing up and going forward and backing up and going forward and been out there for a long time, and they don't know what it's doing. They want . . . somebody to go out there and check it." (*Id.*) Adams then asked, "And [Davis] called?", to which dispatch responded, "Yeah, his grandma called him. . . . She's in there, but she called him." (*Id.*)

At some point that evening, Davis texted Hewett, "You need to check on your boy," apparently referring to Watson. (ECF No. 70-5 at 4.) Hewett subsequently contacted Davis—whereupon Davis told him that someone reported a white car driving erratically in the Bojangles parking lot and that he thought it might be Watson. (Id.) Hewett then spoke to Adams and Watson in turn, the order is uncertain. After speaking with Dispatch, Adams suspected that the car at Bojangles might belong to Watson. (ECF No. 128-2 at 9.) Adams called Hewett to ask "how to handle this." (*Id.*) Hewett told Adams to "do your job" and offered to call Watson to check his location. (*Id.*; ECF No. 72-3 at 14.) Hewett spoke with Watson at approximately 10:39 p.m. (ECF No. 72-3 at 13.) Based on their conversation, Hewett believed Watson was inebriated. (*Id.* at 17.) To prevent Watson from driving, Hewett planned to contact Florence and have her drive

---

[1] Davis acknowledges that he lied about his grandmother, although he asserts that someone did ask him to send an officer to Bojangles. (ECF No. 128-4 at 5.) Specifically, Davis claims that he was sitting at the DMV office when "an old elderly woman pulled up and asked [him] to check in on that car." (*Id.* at 2.) She left no identifying information. (*Id.*) Davis claims that he reported the tip as coming from his grandmother was because "it was an old elderly woman [and] I figured instead of saying some old elderly white-headed lady asked me to check on that, I would just say it as my grandmother." (*Id.* at 5.)

Watson home. (*Id.* at 15.) However, Hewett never learned Watson's location because Watson "got pissed off" after hearing that Hewett planned to call Florence. (*Id.*)

After speaking with Hewett, Adams drove to Bojangles, where he observed a white car leaving the parking lot that matched the description given by the dispatch operator. Adams' Incident Report offers the following account of what occurred when Adams arrived at Bojangles:

> RO [Adams] noticed a white vehicle matching the description leaving Bojangles turning east on Main St. RO stopped at the stop sign on Tammy St and then proceeded east on Main St. RO intended to perform a traffic stop to id the subject and inquire why the subject was in the parking lot at that time of night. As RO got close to subject vehicle, it slowed and gave a signal to turn right into a driveway at 911 W. Main St. RO turned on the Blue Lights and followed the vehicle into the rear of the house. RO exited the patrol vehicle and approached the white car. The driver opened the door to exit and RO noticed that it was David Watson[,] an investigator with Cheraw PD. RO then noticed that Watson was wearing shorts and a T shirt with no shoes on. RO watched as he got out of the vehicle, he grabbed the door for support and was unsteady on his feet. Watson closed the door of his vehicle which was an unmarked Cheraw PD vehicle. Watson then leaned back on the vehicle while RO talked with him. RO noticed that Watson had slurred speech and there was an odor of alcohol coming from the vehicle as well as from his person. Watson admitted that he had been drinking earlier that day and suggested that officers not do this. Trooper Davis from SCHP pulled in behind RO for assistance and began to walk up during the time of Watson exiting the vehicle. RO told Watson to wait at the vehicle for a moment and Watson followed RO toward patrol vehicle. Watson had wide and erratic step, which inferred that he was impaired. RO then turned the blue lights off for the purpose of giving a field sobriety test. RO instructed Watson to stand at the rear of his car. RO turned to respond to Chief Eric Hewett on the phone when RO looked back at Watson he was going inside the door of the house. RO ran to the door calling his name. When RO got to the storm door Watson was closing the wooden door and locked it. Watson would not respond to RO and would not unlock the door. RO had requested that Chief Hewett come and assist.

(Adams' Incident Report, ECF No. 128-2 at 23.)

While the Incident Report offers one version of the events that transpired the evening of June 2, 2012, the Court also has the benefit of the video recordings from

Adams' and Davis' police cars. Specifically, Adams' police car camera began recording before he pulled into the drive way and Davis' police car camera began recording once he arrive on the scene. The Court has reviewed the video evidence, and, based on that review, the following is a description of what can be seen during the stop and arrest of Watson. This first account is taken from Adams' recording.

Adams is following a car that appears to be staying within its lane without any difficulty. At 20 seconds into the video, the car puts on its blinker and turns into a driveway. Adams then turns on his blue lights and follows the car into the driveway, parking behind the car. The door of the white car opens and Watson exits without any apparent difficulty. He shuts the door behind him, standing straight up. Adams then comes into view, approaching Watson. They have the following conversation:

> ADAMS: What's up David?
> WATSON: Hey, what's up, man.
> ADAMS: How much you had to drink tonight?
> WATSON: No, I'm good.
> ADAMS: You sure? We got a call that you was backing around in the parking lot –
> WATSON: No, I just –
> ADAMS: --hanging around out there at Bojangles . . . woman in there was worried, 'cause you was acting strange. Backing around—
> WATSON: No, I just went up there to get on the Internet . . .
> ADAMS: That's what you were doing in the parking lot?
> WATSON: Yeah.
> ADAMS: Well . . . Uh . . . Mary Florence didn't come and get you? You talk to her?
> WATSON: Yeah, she just called.
> ADAMS: How 'bout step back here with me . . . You sure you ain't had nothing to drink?
> WATSON: No, I'm good.
> [unintelligible conversation . . . ]
> WATSON: That's where I get on the internet.

(Adams video, ECF No. 80-17, 22:01:48 – 22:02:33)

As they are talking, Adams steps closer to Watson, and Watson appears to be slightly leaning against his car. He does not appear to need the car for support; rather, it looks like he is casually standing against the car to allow for more room between him and Adams. When Adams asks Watson to move towards his police car, Watson follows him without any apparent difficulty. They continue their conversation, moving almost out of frame. Adams then takes a phone call and they both move out of frame. At about five minutes into the video, Watson moves back into the frame, walking behind his car to the passenger door. He easily opens the door and grabs something from the passenger seat. He then shuts the door, locks the car, and opens the door to a house. Adams can be heard shouting, "Hey! Hey!" and runs into the frame, towards the house. Adams cannot get into the house because Watson has locked the door. Adams steps away from the house and walks back towards his patrol car, out of frame. At this point, Adams' microphone turns off, and the Court turns to Davis' recording.

Davis' police car camera records him arriving at the scene just as Adams' initial interaction with Watson is taking place. Before exiting his car, Davis calls into dispatch that he is out for a possible "10-55" (a DUI). Adams approaches' Davis' car and Davis steps out to meet him. Watson steps into the frame. Adams appears to take a phone call as Davis and Watson have the following conversation:

> DAVIS: How much you had to drink tonight, David?
> WATSON: Leslie.
> DAVIS: David.
> WATSON: I just went over there and got on the Internet. That's all I did.
> DAVIS: How much you had to drink tonight?
> WATSON: I haven't had much drinking at all. Leslie don't do this.
> DAVIS: It was his stop [Motioning toward Adams. Adams is off the phone and joins Davis and Watson].
> WATSON: I mean, what's the stop for?
> ADAMS: Well . . . like I said, I had a call there's a suspicious white vehicle in the parking lot, backing around, moving around, lights off, tinted windows and the women inside was a little nervous.

WATSON: Well, I was backing—
ADAMS: They wanted us to check it out. So I pulled up there, I was watching the car. And before I got down there to the parking lot, you pulled out . . . and that's why I followed you up here and stopped you.
WATSON: I was backing up to get Internet service.
ADAMS: And you haven't had nothing to drink?
WATSON: No.
ADAMS: I can't believe that, David.

(Davis video, ECF No. 80-18, 23:05:22 – 23:06:26)

In his conversations with both Davis and Adams, Watson appears to speak clearly and coherently. After speaking with Watson, Davis walks towards his car and can be heard getting into the car. He begins to call Watson's supervisors, explaining that he is with Watson. He can be heard telling Adams, "Don't let him go in the house," at the point where Watson enters his house and locks the door. Davis then steps out of the car. He connects with one of Watson's supervisors and tells him Watson was driving his patrol car "hammered." Adams tells Davis that Watson entered the house and locked the door. Davis reports this to Watson's supervisor.

Although not shown on the recordings, Adams' Incident Report indicates that a search warrant was eventually obtained. (ECF No. 128-2 at 24.) Chief Hewett was called to the scene and he was able to convince Watson to leave his house. (*Id.*) Adams placed Watson under arrest for Driving Under the Influence of Alcohol ("DUI"). (*Id.*) The Incident Report further states:

RO [Adams] advised Watson of his Miranda rights and offered him a Field Sobriety Test which he refused prior to placing him into the vehicle. RO then looked inside Watson's vehicle for any open containers, there were no open containers, but a prominent odor of alcohol in the vehicle. There was a duty weapon lying in the front seat along with 2 laptop computers. Keith Thomas of Cheraw PD took possession of the vehicle and duty weapon. RO transported Watson to the County Jail and charged him with DUI. Upon arrival at the jail RO placed Watson in the datamaster room for examination. RO removed the cuffs and started the video. RO advised Watson of his Miranda rights again. Watson then responded that he understood them. Watson refused to sign any paperwork involved with this

7

arrest. RO then asked if he would give a breath sample, which Watson refused to submit. RO printed the refusal, filled out the suspension form and confiscated Watson['s] driver[']s license. Watson was then turned over [to] the jail personnel.

(*Id.*)

The next day, Watson lost his job with the Cheraw Police Department. According to Chief Jay L. Brooks, Watson was terminated for the use of alcohol in a police vehicle. (ECF No. 128-6 at 3.) An Administrative Hearing was held on August 4, 2012. In an Order issued August 15, 2012, the Office of Motor Vehicle Senior Hearing Officer rescinded Watson's driver's license suspension, finding that Adams did not have reasonable suspicion to pull Watson over, nor probable cause to arrest him for DUI. (ECF No. 135-3 at 8.) The hearing officer rested this finding on the fact that the police "officer did not know who had placed [the original tip] and could not verify the reliability of the caller." (*Id.*) He found "the officer needed to corroborate the information before there was reasonable suspicion to stop the vehicle." (*Id.*)

Mary Florence has indicated that Watson's arrest and termination was "the last straw," and she apparently broke off all attempts to reconcile with Watson thereafter. On August 29, 2012, Watson committed suicide by a self-inflicted gunshot wound, leaving behind a note explaining that he was taking his life because of the loss of his career and his wife. The South Carolina Department of Public Safety ("SCDPS") began investing the incident surrounding Watson's traffic stop and suicide on October 24, 2014, and terminated Davis on January 11, 2016. (ECF No. 136-7.)

Daniel Watson ("Plaintiff"), as Personal Representative of Watson's estate, filed separate wrongful death and survival actions in the Court of Common Pleas for Chesterfield County on November 2, 2012. Defendants removed these cases to Federal

Court because Plaintiff has asserted claims under 42 U.S.C. § 1983, raising a federal question. In the survival action, Plaintiff brings six separate § 1983 claims against Adams, Hewett, and Davis for unlawfully seizing Watson without reasonable suspicion and for unlawfully arresting Watson without probable cause. Plaintiff also brings two § 1983 supervisory liability claims: one against Hewett and the Town of Chesterfield for their alleged negligent supervision of Adams, and one against SCDPS for its alleged negligent supervision of Davis. Plaintiff brings ten claims under the South Carolina Tort Claims Act ("SCTCA") against the Town of Chesterfield and SCDPS for false imprisonment, false arrest, malicious prosecution, abuse of process, and gross negligence.

Finally, Plaintiff brings several claims against Davis "in the alternative," should he be found to have acted outside the scope of his employment and/or outside the protection of the SCTCA. Plaintiff brings these "alternative" claims under South Carolina law for false imprisonment, false arrest, civil conspiracy, malicious prosecution, and abuse of process.[2]

The wrongful death and survival actions were consolidated and on March 31, 2015, this Court granted summary judgment on Plaintiff's wrongful death action, finding Plaintiff cannot establish that Watson's death was proximately caused by the alleged acts or omissions of Defendants. (ECF No. 111.) Defendants then filed three separate summary judgment motions in this survival action, seeking summary judgment on all the federal and state law claims. (ECF Nos. 125; 127; 128.) The motions have been fully briefed and are ripe for the Court's review.

## STANDARD OF REVIEW

---

[2] On May 8, 2014, Plaintiff voluntarily dismissed all state law claims against Hewett and Adams, as well as the civil conspiracy claims against the Town of Chesterfield and SCDPS. (ECF No. 69.)

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the party moving for summary judgment carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir.1996). "Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.1987). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

### A.    Section 1983 Unlawful Seizure Claims

Plaintiff asserts that Adams, Davis, and Hewett violated Watson's Fourth Amendment rights "by show of force and physically detaining Watson without reasonable suspicion to seize him." (ECF No. 51 ¶¶ 43, 47, 51.) Plaintiff asserts that the seizure was unlawful because it was not based on any allegations of criminal activity, and the

defendants did not personally observe any activity that would indicate criminal activity "was afoot." (ECF No. 135 at 11.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection against unreasonable seizures extends to investigatory stops made by the police. Since *Terry v. Ohio*, 392 U.S. 1 (1968), an officer must have reasonable suspicion to briefly detain an individual for investigative purposes. "Reasonable suspicion" is demonstrated when an officer "point[s] to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). The Fourth Circuit has explained that unlike probable cause, *Terry* does not require officers to believe that an individual "had committed or was committing an offense." *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004). Rather, "the very point of *Terry* was to permit officers to take preventive action and conduct investigative stops before crimes are committed, based on what they view as suspicious—albeit even legal—activity." *Id.* In assessing reasonable suspicion, courts must "consider the totality of the circumstances" and "give due weight to common sense judgments reached by officers in light of their experience and training." *Id.* at 321.

Importantly, "[a] police officer's decision to stop and detain an individual must be evaluated objectively." *Branch*, 537 F.3d at 337 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry*, 392 U.S. at 21–22). "Thus, the lawfulness of a *Terry* stop turns "not on the officer's actual state of mind at the time the challenged action was taken," *Maryland v. Macon*, 472 U.S. 463, 470–71 (1985), but rather on "an objective assessment of the

officer's actions in light of the circumstances confronting him at the time," *Scott v. United States*, 436 U.S. 128, 136 (1978). "In other words, if sufficient objective evidence exists to demonstrate reasonable suspicion, a *Terry* stop is justified regardless of a police officer's subjective intent." *Branch*, 537 F.3d at 337

Based on the information Adams received from Dispatch on June 2, 2012, he believed Davis' grandmother had personally called Davis from inside Bojangles, asking for a policeman to check on "a white car, a four-door car with tinted windows" in the Bojangles parking lot that "keeps backing up and going forward and backing up and going forward and [has] been out there for a long time." (ECF No. 12-3 at 2.) At the Administrative Hearing, Adams testified that his decision to stop Watson on June 2, 2012 was "based entirely" on that information. (ECF No. 29-3 at 5.) The recording from Adams' patrol camera indicates he followed Watson's car about a quarter of a mile once Watson drove out of the Bojangles parking lot. In that time, it does not appear that Watson drove in any sort of erratic manner that would indicate an unfit driver.

Further, the only foreseeable criminal activity that an officer could reasonably suspect based on the information provided was drunk driving.[3] The Supreme Court has thoroughly addressed the issue of when reported behavior gives rise to reasonable

---

[3] Defendants' other offered bases for reasonable suspicion are non sequiturs. Defendants vaguely insinuate that the type of activity reported to Adams provided reasonable suspicion that the suspect driver was preparing to rob Bojangles. (ECF No. 128-1 at 12 ("The vehicle was at the Bojangles at or near closing time, when the employees may be leaving with the day's cash proceeds.").) However, the tipster did not mention any suspicion of a robbery, Adams did not attempt to get more information from the tipster about a potential robbery, and there is no apparent connection between the activity described and that of someone preparing to rob a fast food establishment. Defendants' argument that the traffic stop was justified because Watson's car had tinted windows is likewise baseless. In support, Defendants cite S.C. Code Ann. § 56-5-5015, stating this statute prohibits windows from being tinted beyond various specifications. (ECF No. 138 at 8.) They further state that "pretextual traffic stops are permissive." (Id. (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). While pretextual traffic stops are permissive under some circumstances, Defendants' argument here smacks of ex-post justification for police conduct otherwise lacking in constitutional legitimacy. There is *no evidence* that Watson was stopped on the basis of his tinted windows on the night in question. Assuming arguendo that tinted windows were the basis for the stop, there is no explanation for why the scope of the stop was expanded after Adams realized that the suspect driver was Watson and the suspect vehicle as his unmarked police cruiser. Suffice to say, neither of the foregoing arguments entitle Defendants to summary judgment on this claim, nor do they create a genuine issue of material fact as to reasonable suspicion.

suspicion of drunk driving sufficient to detain someone under the Fourth Amendment. In *Navarette v. California*, 134 S. Ct. 1683, 1686 (2014), a 911 caller reported that a truck had run her off the highway. Shortly thereafter, a highway patrol officer stopped a truck meeting the description and license plate number reported by the caller. *Id.* at 1687. The stop led to the discovery of thirty pounds of marijuana and the arrest of both the driver and the passenger. *Id.* The issue in the case was whether the evidence discovered during the stop should be suppressed in the criminal proceeding because the traffic stop lacked reasonable suspicion. *Id.*

The *Navarette* Court concluded that "the behavior alleged by the 911 caller, viewed from the standpoint of an objectively reasonable police officer, amount[ed] to reasonable suspicion of drunk driving." *Id.* at 1690 (internal alterations and quotation marks omitted) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The Court stated

> The 911 caller in this case reported more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving. Instead, she alleged a specific and dangerous result of the driver's conduct: running another car off the highway. That conduct bears too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness. Running another vehicle off the road suggests lane-positioning problems, decreased vigilance, impaired judgment, or some combination of those recognized drunk driving cues. . . . And the experience of many officers suggests that a driver who almost strikes a vehicle or another object . . . is likely intoxicated. . . . As a result, we cannot say that the officer acted unreasonably under these circumstances in stopping a driver whose alleged conduct was a significant indicator of drunk driving.

*Id.* at 1691.

The *Navarette* Court carefully distinguished these facts from more minor traffic infractions such as "[u]nconfirmed reports of driving without a seatbelt or slightly over the speed limit," finding such infractions "so tenuously connected to drunk driving that a stop

on those grounds alone would be constitutionally suspect." *Id.* Indeed, courts have required much more dangerous behaviors to provide reasonable suspicion of drunk driving. *See*, *e.g.*, *Golden v. State*, No. 01-13-00546-CR, 2015 WL 505222, at *4 (Tex. App. Feb. 5, 2015) (tipster reported a driver failing to drive in a straight line, stopping at a green light, sleeping behind the wheel, and hitting a curb while pulling into a parking lot); *People v. Wells*, 136 P.3d 810, 811 (Cal. 2006) (tipster reported that "a possibly intoxicated person is behind the wheel, 'weaving all over the roadway'"); *State v. Prendergast*, 83 P.3d 714, 715–716 (Haw. 2004) (tipster reported car "cross[ing] over the center line" on a highway, "almost caus[ing] several head-on collisions," and "almost hit[ing] a guard rail"); *State v. Golotta*, 837 A.2d 359, 361 (N.J. 2003) (tipster reported person driving "all over the road" and "weaving back and forth"); *State v. Walshire*, 634 N.W.2d 625, 626 (Iowa 2001) (tipster reported person "driving in the median").

The instant matter lacks any of the indicators of drunk driving mentioned in the above case law. The information provided to Dispatch was merely a description of a car in a Bojangles parking lot that kept "backing up and going forward and backing up and going forward" and had "been out there for a long time." The suspect car was not driving on a public road in a dangerous manner. It was not swerving, crossing the center line, or driving in the median—behavior which would qualify as "paradigmatic manifestations of drunk driving." *Navarette*, 134 S.Ct. at 1691. Because the tip lacked information that would give rise to a reasonable suspicion of drunk driving, the Court finds that it did not provide sufficient indicia of illegality to warrant the investigative stop. Adams' own pre-seizure observations did not cure the defects of the tip. His Incident Report does not document any erratic driving. Moreover, Adams' patrol video shows Watson staying in his lane as he drives the quarter mile to his house from Bojangles, and using his turn

signal as he pulls into his driveway. Under these facts and circumstances, Adams did not have a lawful basis upon which to seize Watson by conducting a traffic stop.

In addition, Davis and Hewett also did not have reasonable suspicion to justify their participation in the seizure of Watson. The Incident Report states that Adams asked Hewett to "come and assist" him as he was carrying out the traffic stop. (ECF No. 128-2 at 24.) Hewett indeed came to the scene and talked to Watson in his home, after which Watson was arrested. (*Id.*) As explained above, the Court finds that Adams had no lawful basis upon which to seize Watson. Because Hewett's reason for continuing to detain Watson stemmed from Adams' unlawful traffic stop, the Court finds Hewett did not have a lawful basis upon which to seize Watson.

Like Hewett, Davis also participated in the seizure of Watson. Davis arrived on the scene shortly after Adams initiated the traffic stop. He questioned Watson about his drinking and later instructed Adams not to let Watson go inside. *See Terry*, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). Davis' participation in the traffic stop appears to be based on the tip he allegedly received at the DMV—Davis did not personally observe Watson's driving before stopping at his house. The Court has explained in detail why this tip did not provide a sufficient assertion of illegality upon which to base reasonable suspicion. Accordingly, Davis also lacked a lawful basis to seize Watson.

For these reasons, the Court finds that Defendants Adams, Davis, and Hewett unlawfully seized Watson and have not carried their burden of demonstrating that summary judgment is appropriate on Watson's § 1983 unlawful seizure claims. *See Celotex*, 477 U.S. at 322–23. However, Defendants argue that even if the Court finds a

constitutional violation occurred, they are entitled to qualified immunity because the right at issue was not clearly established in the specific context of this case. (ECF No. 128-1 at 23.)

Qualified immunity is "a doctrine which shields government actors from liability if they establish either that (1) the plaintiff's allegations fail to make out a violation of a constitutional right, or (2) the right at issue was not clearly established at the time of the alleged misconduct." *Henry v. Purnell*, 619 F.3d 323, 332 (4th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)), *rev'd on other grounds by reh'g en banc*, 652 F.3d 524 (4th Cir. 2011). In short, the doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 555 U.S. at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To resolve a qualified immunity defense, a court must "decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232. The court must then determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.*

Here, the Court has already determined that Plaintiff has established a violation of Watson's constitutional rights in that Watson was detained without reasonable suspicion. Further, there is no question that the right to be free from seizures without reasonable suspicion was clearly established at the time of this incident. Consequently, a reasonable police officer would have known that conducting an investigative stop on the basis of drunk driving without reasonable suspicion of drunk driving was a violation of a person's constitutional right. Accordingly, Defendants are not entitled to qualified immunity and their motions for summary judgment on this claim are denied.

**B.    Section 1983 Unlawful Arrest Claims**

Plaintiff next asserts that Adams, Davis, and Hewett violated Watson's Fourth Amendment rights by arresting him without probable cause. (ECF No. 51 ¶¶ 45, 49, 53.) The standard to determine the lawfulness of an arrest is probable cause. *Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001). To determine the existence of probable cause, a court "examine[s] the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (citations omitted). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (internal quotation marks omitted). "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." *Id.*

As explained above, the Court has found that the initial traffic stop, which culminated in Watson's arrest, violated Watson's constitutional rights. Given this premise, the events following the initial seizure were an extension of this unjustified and unlawful investigation. These Defendants would not have been on Watson's property on June 2, 2012, if not for the unlawful traffic stop. Because Adams, Davis, and Hewett lacked reasonable suspicion to stop Watson in the first place, they equally lacked proper justification to place him under arrest for DUI. Any probable cause that Defendants might argue was developed at the scene of the traffic stop (e.g. by detecting the odor of alcohol once Watson was out of the car, by observing his allegedly faltering ambulation, by discerning his allegedly slurred speech, etc.) was unconstitutionally derived from a seizure that was itself constitutionally unsound. Accordingly, the Court finds that Watson was arrested without probable cause.

The Court further finds that these Defendants are not entitled to qualified immunity on this claim. There is no question that the right to not be arrested except upon probable cause was clearly established at the time of this incident. *See Harlow*, 457 U.S. at 818–19 ("if the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent police officer should know the law governing his conduct"). Consequently, a reasonable police officer would have known that arresting Watson for DUI without reasonable suspicion for conducting the initial investigative stop, and therefore also without probable cause for making the arrest, was a violation of that right. Accordingly, Defendants are not entitled to qualified immunity and their motions for summary judgment on this claim are denied.

### C.    Section 1983 Supervisory Liability Claims

#### 1.    Defendant South Carolina Department of Public Safety

Plaintiff alleges a § 1983 claim under the Fourth Amendment against Defendant SCDPS under a theory of supervisory liability for Davis' actions. A cause of action under § 1983 requires the deprivation of a civil right by a "person" acting under color of state law. 42 U.S.C.A. § 1983. It is well settled that a State cannot be sued under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). This rule applies "to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Id.* at 70. It is also well established that "[f]or Eleventh Amendment purposes, the Department of Public Safety is considered an arm of the State of South Carolina." *S.C. Troopers Fed'n Local 13 IUPA AFL-CIO v. South Carolina*, 112 F. App'x 883, 885 (4th Cir. 2004); *Capell v. Carter*, No. 3:13-CV-586-TLW, 2014 WL 197756, at *3 (D.S.C. Jan. 16, 2014), *aff'd*, 568 F. App'x 199 (4th Cir. 2014) (same).

Accordingly, SCDPS cannot be sued under § 1983 and it is entitled to summary judgment on this claim.[4]

### 2.    Defendants Hewett and the Town of Chesterfield

Plaintiff also alleges a § 1983 claim under the Fourth Amendment against Defendants Hewett and the Town of Chesterfield under a theory of supervisory liability for Adams' actions. The Court has found that Adams violated Watson's constitutional rights in Adams' seizure and subsequent arrest of Watson. Accordingly, there is a predicate constitutional violation to support the supervisory liability claim.

The Fourth Circuit has long recognized a § 1983 supervisory liability claim where a state actor's supervisor (1) has "actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) the supervisor's response to this knowledge was "so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) there is an "affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

In establishing the affirmative link, a plaintiff must do more than point to something that "'could have been done' to prevent the unfortunate incident." *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997). Indeed, a high level of proof is required from plaintiffs asserting a supervisory liability claim. *See Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 207 (4th Cir. 2002) ("[C]ourts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach."). Consistent with the analysis under Rule 56 of the Federal Rules of Civil Procedure, "[t]his high level

---

[4] Plaintiff does not address the assertion of immunity in its response to Defendant's motion for summary judgment. (ECF No. 134.)

of proof cannot be satisfied at the summary judgment stage by the plaintiff's mere allegations." *Wilson v. Kittoe*, 229 F. Supp. 2d 520, 537 (W.D. Va. 2002).

Here, Plaintiff has failed to establish a § 1983 claim against Hewett or the Town of Chesterfield based on a theory of supervisory liability because Plaintiff has not produced any evidence that these Defendants had actual or constructive knowledge of Adams engaging in pervasive or widespread conduct that posed a risk of unlawful seizures and arrests to citizens. As evidence of these Defendants' constructive knowledge of the conduct which led to Watson's seizure and arrest, Plaintiff relies almost entirely on Adams' testimony at the Administrative Hearing:

> [I]n Chesterfield, we have had several, several car break-ins. It's been all around the state and all around the county. We have had break-ins in people's storage sheds, backyards. Any suspicious car called in in [sic] the Chesterfield town will be investigated under these same instances. We will stop the car and we will find out. Even if I think I know who's in the car, I'm not going to put it down till I stop them, ID them, find out what they were doing there. That is our standard practice and that's the way it'll be done from now on. If a suspicious car is called in for any business in town or any personal yard or driveway, it will be investigated the same way.

(ECF No. 51-1 at 6.) While Adams may have believed it was "standard practice" to stop any "suspicious" car that was reported, there is no evidence such conduct was considered "standard practice" by Hewett or the Town of Chesterfield.

Plaintiff also cites Hewett's participation in the seizure and arrest of Watson as evidence of his knowledge of Adams' pervasive misconduct. However, isolated incidents are insufficient to establish supervisory liability. *See Anderson v. Davies*, No. 3:10-2481-CMC-JRM, 2012 WL 1038663, at *2 (D.S.C. Mar. 8, 2012) ("'A pervasive risk of harm (under this principle) may not ordinarily be shown by pointing to a single incident or isolated incidents,' nor is a '(s)howing that individual officers violated a person's constitutional rights on an isolated occasion . . . sufficient to raise an issue of fact

whether adequate training and procedures were provided.'" (internal citations omitted) (alterations in original)). Putting aside the night in question, there is no evidence of other instances where this type of conduct occurred. Adams' subjective belief that his conduct was "standard practice" in Chesterfield, without more, cannot satisfy the high level of proof required to establish a supervisory liability claim. *See Randall*, 302 F.3d at 207.

### D.    State Claims

Plaintiff next alleges claims for false imprisonment and false arrest against Defendant Town of Chesterfield for the actions of Hewett and Adams, as well as claims for abuse of process, malicious prosecution, and grossly negligent supervision. (ECF No. 51 ¶¶ 55, 57.) Plaintiff further alleges claims for false imprisonment and false arrest against Defendant SCDPS for the actions of Davis, as well as claims for abuse of process, malicious prosecution, and grossly negligent supervision. Plaintiff also alleges claims against Davis, in the alternative, for false imprisonment, false arrest, malicious prosecution, abuse of process and civil conspiracy. Plaintiff brings the claims against Town of Chesterfield and SCDPS under the SCTCA, and brings the claims against Davis, individually, under state common law.

### 1.    S.C. Code Ann. § 15–78–20(b)

As an initial matter, SCDPS claims that it is not liable for Davis' actions under the SCTCA because he acted outside the scope of his employment in committing the conduct alleged by Plaintiff. (ECF No. 138 at 6–7.)

The SCTCA grants to the State, its political subdivisions, and employees, while acting within the scope of official duty, immunity from liability for any tort, except as waived therein. S.C. Code Ann. § 15–78–20(b). Section 15–78–70(a) provides that "[t]his chapter constitutes the exclusive remedy for any tort committed by an employee of a

governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided for in subsection (b)." However, an employee does not have immunity from suit "if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15–78–70(b). Additionally, the SCTCA expressly states that "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude" is an exception to South Carolina's waiver of immunity. S.C. Code Ann. § 15–78–60(17).

In arguing for immunity, SCDPS claims Plaintiff has alleged that Davis "intentionally orchestrated a plot to have Watson arrested for a crime he did not commit." (*Id.* at 7.) Indeed, if Davis completely fabricated the tip as a basis to seize and arrest Watson, this would constitute "behavior [] so wildly beyond what could have been anticipated or managed by his . . . employer that the state cannot reasonably be held responsible for it." *See Newkirk v. Enzor*, No. 4:13-CV-01634-RMG, 2015 WL 3853148, at *4 (D.S.C. June 19, 2015) (finding issue of fact as to whether employee acted within the scope of his employment for purposes of claims brought against his employer under the SCTCA).

However, such a conclusion cannot be made as a matter of law. The governmental entity claiming an exception to the waiver of immunity under the SCTCA has the burden of establishing any limitation on liability and SCDPS has failed to do so here. *Faile v. S.C. Dep't of Juvenile Justice*, 566 S.E.2d 536, 540 (S.C. 2002). While Davis admits he lied to Dispatch about the tip being from his grandmother, he asserts that the tip was still reported to him by an elderly woman. Ultimately, it is a jury question

22

as to whether Davis' testimony is credible and thus, whether he fabricated the tip or not. Accordingly, determining the actual nature of Davis' actions would be premature at this stage. Because there remains a genuine issue of material fact to be determined by a jury, the Court cannot grant SCDPS summary judgment on this basis.[5]

Should the jury find that Davis acted outside the scope of his employment, Plaintiff has pled, in the alternative, state law claims against Davis in his individual capacity. The federal rules' liberal pleading requirements allow a plaintiff to plead alternative theories of relief, even if these theories are inconsistent with one another. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Therefore, although Plaintiff may only ultimately recover for Davis' alleged torts either on his SCTCA claims against SCDPS or his state tort claims against Davis, it is appropriate for him to plead both iterations of these claims in this action.

### 2.      False Imprisonment

"False imprisonment is the deprivation of one's liberty without justification." *Argoe v. Three Rivers Behavioral Health, L.L.C.*, 710 S.E.2d 67, 73 (S.C. 2011). To state a claim for false imprisonment, a plaintiff must allege (1) the defendant restrained him and the restraint was (2) intentional and (3) unlawful. *Id.* False imprisonment "does not require an actual injurious touching," and it may occur "by words alone, or by acts alone or by both, and by merely operating on the will of the individual, or by personal violence, or by both." *Jones by Robinson v. Winn–Dixie Greenville, Inc.*, 456 S.E.2d 429, 432 (S.C. Ct. App. 1995).

---

[5] Also, the fact that Davis is accused of committing intentional torts, in and of itself, does not establish that he acted with "actual fraud, actual malice, intent to harm, . . . or moral turpitude." S.C. Code Ann. § 15–78–70(b). Defendant SCDPS cannot be granted immunity solely on this basis. *See Newkirk*, 2015 WL 3853148, at *4 ("[A]n intentional action sufficient to support an intentional tort claim is not necessarily coterminous with the 'intent to harm' exemption found in the SCTCA.").

###### a.    SCDPS and Davis

SCDPS argues that Davis never restrained Watson because he only participated in the seizure in a "backup capacity." (ECF No. 125-1 at 13.) However, as explained in the Court's analysis of Plaintiff's § 1983 claims, Davis indeed unlawfully seized Watson. During the traffic stop, Davis questioned Watson about his drinking and later instructed Adams not to let Watson go inside. *See Terry*, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). Davis' conduct during the traffic stop makes clear that he intended to question Watson and prevent him from leaving the scene. At the very least, Davis used words that could be construed by a fact finder as designed to operate on Watson's will and keep him from entering his own home. *See Jones by Robinson*, 456 S.E.2d at 432.The Court has previously found this seizure was made without reasonable suspicion. Accordingly, these Defendants have failed to carry the initial burden of demonstrating that summary judgment is appropriate and their motions are denied on this issue.

As explained in the immunity analysis under S.C. Code Ann. § 15–78–20(b), there is a genuine dispute of material fact as to whether Davis acted within the scope of his employment in seizing Watson. Should a jury conclude that he acted within the scope of his employment, then SCDPS could be liable for the actions of Davis under Plaintiff's false imprisonment claim. Should a jury come to the opposite conclusion, then Davis could be liable for false imprisonment under state common law. SCDPS and Davis are therefore not entitled to summary judgment on this claim.

### b.    Town of Chesterfield

Defendant's sole argument against liability for false imprisonment is that there was probable cause to seize and arrest Watson. (ECF No. 128-1 at 26.) However, the Court has already determined that Watson was unlawfully seized and arrested as a matter of federal law. There is no question that Adams and Hewett intentionally seized and arrested Watson. Accordingly, the Court finds that the Town of Chesterfield has not demonstrated that summary judgment is appropriate and its motion is denied on this issue.

### 3.    False Arrest

To prevail on a false arrest claim, a plaintiff must establish that his arrest was not lawful. *Wortman v. Spartanburg*, 425 S.E.2d 18 (S.C. 1992). "The fundamental question in determining whether an arrest is lawful is whether there was 'probable cause' to make the arrest." *Id.* at 20.

### a.    SCDPS and Davis

The Court concluded above that Watson was arrested without probable cause as a derivative of the initial seizure being unlawful, and that Davis shares liability for that constitutionally unsound arrest. Under South Carolina law, "Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe likewise." *Id.* (citing *Gathers v. Harris Teeter Supermarket*, 317 S.E.2d 748 (S.C. Ct. App. 1984)). Of course, in the context of Plaintiff's federal constitutional claims, state law regarding probable cause can be *more* protective of Watson's Fourth Amendment rights *but not less*. Given the manner in which the issue of the merit of Plaintiff's state law claims has been presented to the Court—by way of

Defendants' motions for summary judgment—the Court would not presume to make ultimate findings at this juncture regarding the false arrest claim, for the South Carolina Supreme Court has noted that "the issue of probable cause is a question of fact and ordinarily one for the jury." *Id.* (citing *Jones v. City of Columbia*, 389 S.E.2d 662, 663 (S.C. 1990)). It is enough to say that SCDPS and Davis have certainly not demonstrated, as an initial matter, that summary judgment is appropriate on Plaintiff's false arrest claim and their motions are denied on this issue. Again, should a jury conclude that Davis acted within the scope of his employment in arresting Watson, then SCDPS could be liable for the actions of Davis under Plaintiff's false arrest claim. And should a jury come to the opposite conclusion, then Davis could be liable for false arrest under state common law.

### b.     Town of Chesterfield

Defendant's sole argument against liability for false arrest is that there was probable cause to arrest Watson. (ECF No. 128-1 at 26.) For the same reasons explained in the foregoing subsection of this order, the Town of Chesterfield has not demonstrated that summary judgment is appropriate and its motion is denied on this issue.

### 4.     Malicious Prosecution

Plaintiff next alleges malicious prosecution claims under the SCTCA against Defendant Town of Chesterfield and SCDPS. He also alleges a malicious prosecution claim against Davis under state law, in the alternative. However, South Carolina courts do not recognize malicious prosecution claims in a survival action.[6] *See*, *e.g.*, *Jolly v. Gen. Acc. Grp.*, 382 F. Supp. 265, 267 (D.S.C. 1974) ("Over the years, a number of cases have recognized that there are certain personal torts which do not survive, even

---

[6] Plaintiff does not respond to this assertion made by Defendants in any of his briefs.

under the Survival Statute, among them being causes of action for libel, slander, fraud and deceit, and malicious prosecution."); *Brewer v. Graydon*, 103 S.E.2d 767, 769 (S.C. 1958) ("[T]his Court has held that actions for malicious prosecution, slander, and fraud and deceit do not survive [under the Survival Act]."). In other words, Watson's right to recover for injuries caused by his alleged malicious prosecution do not survive his death—his estate cannot recover for those injuries in this survival action. Defendant Town of Chesterfield and SCDPS are therefore entitled to summary judgment on this claim. Davis would likewise not be liable for malicious prosecution under state common law and is also entitled to summary judgment on this claim.

### 5.    Abuse of Process

The abuse of process tort provides a remedy for one damaged by another's perversion of a legal procedure for a purpose not intended by the procedure. *See Huggins v. Winn-Dixie Greenville, Inc.*, 153 S.E.2d 693, 695 (S.C. 1967) ("[A]n abuse of process is the employment of legal process for some purpose other than that which it was intended by the law to effect-the improper use of a regularly issued process."). A plaintiff alleging abuse of process in South Carolina must assert two essential elements: 1) an "ulterior purpose," and 2) a "willful act in the use of the process not proper in the conduct of the proceeding." *Hainer v. Am. Med. Int'l, Inc.*, 492 S.E.2d 103, 107 (S.C. 1997); *see LaMotte v. Punch Line of Columbia, Inc.*, 370 S.E.2d 711 (S.C. 1988). "An ulterior purpose exists if the process is used to gain an objective not legitimate in the use of the process." *First Union Mortgage Corp. v. Thomas*, 451 S.E.2d 907, 914 (S.C. Ct. App. 1994); *see Davis v. Epting*, 454 S.E.2d 325 (S.C. Ct. App. 1994) (finding no ulterior purpose where the record presented no evidence the process was used to gain anything other than a right to access disputed property); *Rycroft v. Gaddy*, 314 S.E.2d 39, 44

(S.C. Ct. App. 1984) (holding no ulterior purpose was shown where defendants' use of subpoena to obtain bank records was for the "entirely legitimate purpose" of gathering evidence).

### a.    SCDPS

Plaintiff alleges that SCDPS "instituted the criminal proceedings against Watson despite knowing they lacked probable cause for the initial traffic stop and subsequent search warrant and arrest" and that in so doing, SCDPS "implicitly acted with an ulterior purpose in instituting [these] proceedings." (ECF No. 51 ¶ 86.) SCDPS argues that these allegations place this claim squarely within one of the exceptions to waiver of immunity under the SCTCA. Specifically, Section 15-78-60(23), which provides immunity for the "institution or prosecution of any judicial or administrative proceeding." S.C. Code Ann. § 15-78-60(23). The Court agrees that Plaintiff's apparent basis for an abuse of process claim against SCDPS rests on its alleged institution of criminal proceedings against Watson. Because the conduct alleged here falls within the express exception highlighted above, SCDPS is entitled to summary judgment on this claim.

### b.    Town of Chesterfield

Like SCDPS, Defendant argues here that Plaintiff's allegations under this claim place it squarely within one of the exceptions to waiver of immunity under the SCTCA.[7] The Court agrees that Plaintiff's apparent basis for an abuse of process claim against Town of Chesterfield rests on its alleged institution of criminal and administrative proceedings against Watson. Because the conduct alleged here falls within the express

---

[7] As with SCDPS, Plaintiff alleges here that Town of Chesterfield "instituted the criminal proceedings and administrative proceedings against Watson despite knowing they lacked probable cause for the initial traffic stop and subsequent search warrant and arrest" and that in so doing, Town of Chesterfield "implicitly acted with an ulterior purpose in instituting [these] proceedings." (ECF No. 51 ¶ 69.)

exception highlighted above, Town of Chesterfield is entitled to summary judgment on this claim.

### c.    Davis

Plaintiff asserts an abuse of process claim against Davis in the alternative, should a jury find he did not act in the scope of his employment. (ECF No. 51 ¶ 151.) Here, Plaintiff has alleged that Davis fabricated the tip against Watson and then unlawfully seized and arrested him in order to ultimately cause Watson to be terminated from his detective position with the Cheraw Police Department. (ECF No. 136 at 22–24.) Plaintiff has presented evidence from which a reasonable jury could determine Davis acted with the ulterior purpose of causing Watson to lose his job. Specifically, he cites the following testimony from Davis' deposition:

> Q. Okay. All right. And you were aware that he [Watson] was terminated the next morning---
> A. Yes, sir.
> Q. ---from his job, is that right?
> A. Just like I would be if I was stopped.
> Q. And you, you understood that that night while y'all were out there, didn't you?
> A. Yes, sir.

(ECF No. 136-2 at 14.) A reasonable jury could find that Watson's termination was an illegitimate "collateral aim" sought by Davis through Watson's seizure and arrest. *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 567 S.E.2d 251, 256 (S.C. Ct. App. 2002) ("[T]he ulterior purpose allegation must be accompanied by an allegation that the process was misused by the undertaking of the alleged act, not for the purpose for which it was intended but for the primary purpose of achieving a collateral aim.").

Plaintiff has also presented evidence of a willful act through which Davis abused the legal process, specifically, by calling in a fabricated tip. As previously explained, a

reasonable jury could find Davis' testimony as to the source of the tip to be not credible. Indeed, it is undisputed that Davis' lied about the observations of Watson's vehicle in the Bojangles parking lot purportedly coming from his "grandmother." This fact, in conjuction with Davis' admitted knowledge of the consequences for Watson of the traffic stop and DUI arrest, is more than enough to put Plaintiff's abuse of process claim against Davis beyond the realm of mere speculation. Accordingly, a jury could find Davis willfully abused the legal process by calling in a wholly fabricated tip to Dispatch, thereby instigating the unlawful seizure and arrest of Watson. Such a finding would further bolster Plaintiff's allegation that Davis' unlawful conduct was motivated by his desire to see Watson lose his job. *Food Lion*, 567 S.E.2d at 255 ("[A]n ulterior purpose may be inferred from an improper willful act.").

Davis is not entitled to summary judgment on this claim and his motion is denied in this respect.

### 6.     Grossly Negligent Supervision

In South Carolina, an employer may be liable for negligent supervision if the employee intentionally harms another when the employee: (1) is upon the premises of the employer, or is using a chattel of the employer, (2) the employer knows or has reason to know that he has the ability to control his employee, and (3) the employer knows or should know of the necessity and opportunity for exercising such control. *Degenhart v. Knights of Columbus*, 420 S.E.2d 495, 496 (S.C. 1992).

In circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer acted negligently in entrusting its employee with a tool that created an unreasonable risk of harm to the public. *James v. Kelly Trucking, Co.*, 661

30

S.E.2d 329, 330 (S.C. 2008). Supervisory liability requires the court to focus specifically on what the employer knew or should have known about the specific conduct of the employee in question. *See also Rickborn v. Liberty Life Ins. Co.*, 468 S.E.2d 292, 302–03 (S.C. 1996) (finding defendant employer breached duty of care to plaintiff who was harmed by its employee/agent's negligent mishandling of insurance application because employer had notice of that employee/agent's prior negligent mishandling of insurance applications). "The standard, according to the Restatement section 317 comment c, is whether the employer knew the offending employee was 'in the habit of misconducting [himself] in a manner dangerous to others.'" *Doe v. ATC, Inc.*, 624 S.E.2d 447, 450 (S.C. Ct. App. 2005).

### a.    SCDPS

Plaintiff alleges that SCDPS was grossly negligent in its supervision of Davis. (ECF No. 51 ¶ 175.) The parties' central dispute here focuses on whether SCDPS had the requisite knowledge sufficient of misconduct by Davis to support a negligent supervision claim. Plaintiff's negligent supervision claim alleges that "SCDPS had actual or constructive knowledge" of Davis' prior misconduct and that SCDPS knew such conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens" like Watson. (ECF No. 51 ¶ 174.) As evidence of this knowledge, Plaintiff cites four complaints made against Davis prior to the incident with Watson, two written and two made by phone. The first complaint was made by Ricky Malloy ("Malloy") on June 30, 2009. (ECF No. 134-2 at 7–8.) In it, Malloy writes:

> Beginning approximately 2 years ago (2007)[,] I started having problem[s] with trooper Davis, after I started dating his ex-girlfriend. He started following me, my employees, and whomever was driving my vehicles. He made threats, sent messages by others and wrote anyone involved with me a ticket. Wrote me a $150 ticket for a bulb out on my tag light. From there I took my situation to trooper Davis['] local level supervisor[,] Sam.

> Sam assured me that he would take care of it, including the ticket, which by the way he didn't. . . . [Davis] is constantly riding by my house, slinging his patrol car around in my front yard. Honestly, I have tried to contact him, to solve this but he only comes around when he's working. I told him once before that I would contact Captain Wright. He replied, ["]I don't care what you do.["] That I could call whoever I wanted to.

(*Id.*) Malloy also writes that Davis also harassed his fiancée, stating Davis used to follow her to school. (*Id.* at 8.) Referring to Davis, Malloy further writes,

> Trying to use his power to get his way or to scare people really looks bad on SCHP [South Carolina Highway Patrol]. My only wish is that it stops. I hear only bad things on Trooper Davis. It seems I'm not the only one who has complaints. Something needs to be done before something bad happens. . . . I worked for the Chesterfield County Sheriff's Department as a deputy and I know this is not at all how a law officer should conduct himself (certainly not a SCHP). This is a very mild description of his actions and attitude.

(*Id.* at 8–9.)

Two witnesses came forward following Malloy's complaint, providing specific instances of Davis' misconduct that substantiated the allegations made by Malloy. On June 30, 2009, Malloy's friend, Phillip A. Reep ("Reep"), called the SCDPS Office of Professional Responsibility ("OPR") to report that Davis "has stopped him and his friends for various reasons on several occasions." Reep believed "the reason he was stopped was because Trooper Davis knew he and Malloy were friends." (*Id.* at 10.) Also on June 30, 2009, Hillary Brewer ("Brewer"), Malloy's fiancé, called OPR, reporting that after she originally met Davis, "he began sending her text messages, telling her to slow down or he would ticket her." (*Id.* at 11.) She reported that Davis eventually stopped texting her, but contacted her when she moved to Charlotte. (*Id.*) Brewer said that she never dated Davis. She said she had noticed Davis' patrol vehicle at her place of employment more recently and "had concerns." (*Id.*)

Davis' investigative file indicates that Davis completely denied the allegations made by Malloy, Reep, and Brewer. (*Id.* at 12.) The OPR ultimately classified the allegations as "Not Sustained." (*Id.* at 13.) The file contains little insight into how the OPR came to this conclusion—there is no evidence that OPR ever followed up with Malloy, Reep, or Brewer.

A second written complaint was made by Frankie A. Thompson ("Thompson") on December 7, 2009. (ECF No. 134-2 at 34.) Thompson alleges that Davis watched Thompson as he exited a KFC in his car and began to follow him in his patrol vehicle. (*Id.*) Davis eventually pulled him over and gave him a ticket for speeding. (*Id.* at 35.) Thompson alleges that while he was speeding, he was not driving at the speed written by Davis on the citation. (*Id.*) He writes

> [Davis] has a bad attitude and always has with me. He has harassed me many[,] many times before. He has a personal problem with my cousin and he takes it out on anyone driving his truck. . . . I, along with many others, think that looks terrible on the SCHP and certainly on him. . . . I know Ricky Malloy filed a complaint and nothing has been done because I was one of the witnesses and I was never contacted.

(*Id.*)

The OPR conducted an internal investigation regarding this complaint. (*Id.* at 28.) Its "Synopsis of Investigation" states that the investigator, Keith O'Quinn ("O'Quinn") conducted a traffic summons audit to determine if Davis had previously issued Thompson any traffic citations, reviewed the recording of the traffic stop detailed in the complaint, and interviewed Thompson and Davis. (*Id.* at 28–30.) O'Quinn concluded that "Thompson's allegations of harassment could not be corroborated" and closed the case on May 24, 2010. (*Id.* at 36, 53.) The OPR ultimately classified the allegations as "Unfounded." (*Id.* at 54.)

The Court finds that, based on the complaints detailed above, a genuine dispute of material fact exists as to whether SCDPS knew that Davis was "in the habit of misconducting himself in a manner dangerous to others." *Doe*, 624 S.E.2d at 450. The complaints received by SCDPS describe Davis using his position as an officer with the South Carolina Highway Department to harass others through, *inter alia*, traffic stops. The misconduct alleged in the instant matter is, essentially, that Davis used his position as an officer to harass Watson by fabricating a tip that would result in a traffic stop. Because a reasonable jury could find that these complaints alerted SCDPS to the fact that Davis' harassment could cause harm, and could further find that Davis intentionally harassed Watson in this instance by fabricating the tip that resulted in a traffic stop, summary judgment is not appropriate. *See Rickborn*, 468 S.E.2d at 302–03.

### b.    Town of Chesterfield

Plaintiff alleges that Town of Chesterfield was grossly negligent in its supervision of Adams. (ECF No. 51 ¶ 163.) Plaintiff rests this entire claim on Adams' testimony at the Administrative Hearing. (ECF No. 135 at 34.) Specifically, Adams testified that when he decided to pull Watson over, "We were strictly responding on a suspicious vehicle call which we get several of and we respond to every one of them in the same manner." (ECF No. 51-1 at 4.) Plaintiff argues that "The simple fact that Adams has and continues to believe that his stop of Watson was righteous is all the evidence Plaintiffs [sic] require to submit the matter to a jury." (ECF No. 135 at 35.) However, that "fact" is clearly not all Plaintiff needs to establish in order to survive summary judgment on this claim. Plaintiff has failed to provide evidence that the Town of Chesterfield had knowledge of prior instances of misconduct by Adams, and has not sustained his burden to set forth specific

facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322-23. Thus, the Town of Chesterfield is entitled to summary judgment on this claim.

### 7.    Civil Conspiracy

Plaintiff also alleges, in the alternative, a common law civil conspiracy claim against Davis.[8]   (ECF No. 51 ¶ 142.) Under South Carolina law, a plaintiff must allege three elements to state a claim for civil conspiracy: (1) a combination of two or more persons (2) for the purpose of injuring the plaintiff that (3) causes the plaintiff special damage. *Hackworth v. Greywood at Hammett*, LLC, 682 S.E.2d 871, 874 (S.C. Ct. App. 2009). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Id.* Moreover, because the essence of a civil conspiracy claim is the special damage resulting to the plaintiff, the alleged damages must exceed the damages alleged for the plaintiff's other claims. *Id.*

Here, the Complaint fails to plead any additional acts in furtherance of a conspiracy. Under the civil conspiracy cause of action, the Complaint alleges that

> 141. Defendant DAVIS combined with others for the purposes of injuring WATSON. For the purposes of this cause of action, "others" is meant to include, but not be limited to Defendant TOWN OF CHESTERFIELD, Defendant SCDPS, Defendant HEWETT and Defendant ADAMS.

> 142. Defendant DAVIS conspired with others to injure WATSON through their actions and or failures to act as described in paragraphs ten (10) through thirty-five (35) above.

(ECF No. 51 ¶¶ 141, 142.) Under this cause of action, Plaintiff has done no more than allege the existence of a civil conspiracy and then incorporate prior allegations. *Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607, 611 (S.C. 1981) (dismissing plaintiff's civil conspiracy claim because "the [civil conspiracy] action does no more than

---

[8] The parties have indicated that all other civil conspiracy claims were voluntarily dismissed. Although it does not appear that Plaintiff voluntarily dismissed this claim, neither Plaintiff nor Davis mentions it in their respective briefs.

incorporate the prior allegations and then allege the existence of a civil conspiracy and pray for damages resulting from the conspiracy. No additional acts in furtherance of the conspiracy [were pled]"). Because the civil conspiracy claim lacks any allegation of acts that are separate and independent from other wrongful acts alleged in the Complaint, dismissal is appropriate. *See Hackworth*, 682 S.E.2d at 875 ("In a civil conspiracy claim, one must plead additional acts in furtherance of the conspiracy separate and independent from other wrongful acts alleged in the complaint, and the failure to properly plead such acts will merit the dismissal of the claim."); *see also Doe v. Erskine Coll.*, No. 8:04–23001-RBH, 2006 WL 1473853, at *17 (D.S.C. May 25, 2006) (granting defendant's motion for summary judgment on plaintiff's civil conspiracy action because "the Complaint does not plead specific facts in furtherance of the conspiracy; instead the Complaint simply restates alleged wrongful acts pled in relation to the plaintiff's other claims for damages."); *James v. Pratt & Whitney*, 126 Fed. Appx. 607, 613 (D.S.C. 2005) ("If appellant failed to allege facts for his civil conspiracy claim separate and distinct from his other two claims, then his civil conspiracy claim would fail under *Todd*."); *Kuznik v. Bees Ferry Assocs.*, 538 S.E.2d 15, 31 (S.C. Ct. App. 2000) ("Because [the third party plaintiff] . . . merely realleged the prior acts complained of in his other causes of action as a conspiracy action but failed to plead additional acts in furtherance of the conspiracy, he was not entitled to maintain his conspiracy cause of action."). This claim therefore fails as a matter of law and summary judgment is granted.

## CONCLUSION

For the reasons set forth above, the motions are granted in part and denied in part. Specifically, Defendant SCDPS' motion for summary judgment (ECF No. 125) is GRANTED IN PART and DENIED IN PART. SCDPS is entitled to summary judgment on

Plaintiff's claims for supervisory liability under § 1983, as well as Plaintiff's state claims for malicious prosecution and abuse of process. SCDPS is not entitled to summary judgment on Plaintiff's claims for false imprisonment, false arrest, and grossly negligent supervision. Defendants Town of Chesterfield, Hewett, and Adams' motion for summary judgment (ECF No. 128) is also GRANTED IN PART and DENIED IN PART. Adams and Hewett are denied summary judgment on Plaintiff's § 1983 claims for unlawful seizure and unlawful arrest. Hewett and Town of Chesterfield are entitled to summary judgment on Plaintiff's § 1983 claim for supervisory liability. Town of Chesterfield is entitled to summary judgment on Plaintiff's state claims for malicious prosecution, abuse of process, and grossly negligent supervision. Town of Chesterfield is not entitled to summary judgment on Plaintiff's state claims for false imprisonment and false arrest. Finally, Defendant Davis' motion for summary judgment (ECF No. 127) is GRANTED IN PART and DENIED IN PART. Davis is entitled to summary judgment on Plaintiff's state claims for malicious prosecution and civil conspiracy. Davis is not entitled to summary judgment on Plaintiff's § 1983 claims for unlawful seizure and unlawful arrest, nor for Plaintiff's state law claims for false imprisonment, false arrest, and abuse of process.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

Greenville, South Carolina
March 15, 2017